LLOYD HELTON, RESPONDENT, v. FRANK J. HAWKINS, APPELLANT.*

In the Springfield Court of Appeals. January 7, 1927.

---

*Corpus Juris-Cyc. References: Evidence, 23CJ, p. 144, n. 30; p. 151, n. 51; Explosives, 25CJ, p. 210, n. 8, 9; Negligence, 29Cyc, p. 504, n. 34; p. 587, n. 57; Trial, 38Cyc, p. 1543, n. 69; p. 1548, n. 31 New.

*Mann & Mann* for appellant.

*Neale & Newman* for respondent.

BAILEY, J.—This is an action for damages growing out of injuries to the person and property of plaintiff caused by a fire in a garage in which he was employed as a mechanic, at Ash Grove. The only grounds of negligence alleged in the petition are couched in the following language: ''That on the said 11th day of October, 1924, and on the forenoon of that day, the defendant came into the said garage, and, coming back to where the plaintiff was working, engaged him in conversation; that the plaintiff at that time was standing at or near a tank of gasoline and was cleaning his hands by washing them in gasoline which was running from a container or tank down into a basin; that while plaintiff was so engaged, and while he was in the exercise of ordinary care and caution, the defendant carelessly, negligently and recklessly struck a match, and carelessly, negligently and recklessly threw the said lighted match into and against the said gasoline, causing it to ignite and explode.

Plaintiff further states that when the gasoline was so caused to ignite and explode, that it caused the flames and fire to extend over plaintiff's hands, arms and body, igniting his clothing and burning his flesh, etc.'' The answer was a general denial. The trial resulted in a verdict for plaintiff in the sum of $1750 and from the judgment rendered thereon, defendant has appealed.

The principle point raised on this appeal relates to the failure of the trial court to give the jury a peremptory instruction to find for defendant. We shall, therefore, set out the evidence most favorable to plaintiff's case, having in mind the rule that all such evidence, for the purpose of the demurrer, shall be taken as true and that plaintiff is entitled to every inference reasonably deducible therefrom but that the evidence and inferences favorable to defendant shall be disregarded. There were but two witnesses to the accident, plaintiff and defendant. Plaintiff testified that on a certain day in October, 1924, he was working as a mechanic for the Wilkerson Motor Company in their garage at Ash Grove; that at that time he knew defendant Frank Hawkins; that on this particular day Hawkins came into the garage at which time a co-employee, Clarence Wagner, and plaintiff's wife, were present; that the garage was about thirty feet in width, east and west, and something over 100 feet in length; that the back twenty or twenty-five feet of the garage floor was eighteen or twenty inches lower than at the front end; that a little north of this offset and against the east wall of the building stood a gasoline tank

on a trestle high enough so a five gallon can could get under it; that in the rear end of the building was a generator for charging batteries from which wires were run to a battery table located about twelve feet south of the gasoline tank; that there was a work bench or table used to set motors on, which was located in the neighborhood of ten feet west of the gasoline tank and on farther west was another work bench; that on the east end of the work bench used to set motors on was fastened a motor support which projected over the east end of the bench "twenty-four inches or better;" that, "When Mr. Hawkins came in that morning I was standing down on the back in the offset portion of the floor, the lower part of it, about half way back. I met him at this work bench which I say was directly west of the gasoline tank. We engaged in conversation there. It was just general conversation. Then the conversation come up about the last as to a trip I had made out to his house to see about his tractor—what was wrong with it—and I went out there; and he wanted to pay me for the trip, and I told him he didn't owe me anything; he had taken out some money out of his pocket and offered me a dollar already, and I refused it; and, in the meantime, while we was talking there he stood there and filled up his pipe and held it in one hand like that (indicating) and he put the dollar back in his pocket and stood there and talked awhile longer, and said he would rather pay me; and then I started over to the gasoline tank to wash my hands, and I turned the faucet on into the crock below.

"The faucet was in the west end of the tank, and at the lower side. The tank was elevated something like fifteen or twenty inches above the floor. He was still standing near the end of this work bench, directly west of the gasoline tank when I turned on this faucet. I just stepped around the south end of it and squatted down and began to wash my hands. He was standing almost directly west of the tank where I was washing my hands.

"Q. Now, while you were there washing your hands, what, if anything, did he do? A. Well, he turned slightly towards me, and said, 'Well, I would rather pay you.' I told him I didn't care for any pay for it as I didn't do the truck any good and couldn't get back out there to fix it. He turned, and as he turned he took the match, took a match out of his pocket and struck it on that motor' support that was on the work bench there sticking out from the end, and he just turned there and as he started to leave he just —lit his pipe as he was turning—and give the match a toss slightly over his shoulder, towards me (indicating)—come for the gas.

"Q. Now, what did you do, Loyd, when you saw this match coming toward the gasoline? A. I started to jump—to get up on my feet so I could jump. At that time I had both hand and arms

thoroughly covered with that gasoline. I raised and tried to jump west.

"Q. What happened? A. I was afire before I ever got straightened out.

"Q. What part of you was afire? A. My arm; clothing.

"Q. Where was he standing, now, when you got up after the flash came and you caught fire? You say you jumped to the west? A. Yes, sir.

"Q. Where was he standing at that time when you got up where you could see him? A. Well, he probably was about five or six feet away from me. I run towards him. My arms were up like this (illustrating), they was a solid mass of flames. I asked him to 'put me out,' but he did not. He says, 'Keep away from me.' I do not know what became of him. He did not help put out the flames on me or do anything about helping extinguishing the fire on my body. I were burning so up here, and my hands, I stooped over and doubled up and put my hands between my legs and drug most of it out that way. I did not entirely succeed in putting out the fire on my arms and hands. Clarence Wagner the other mechanician employed in the garage threw a jumper over the places burning on my leg and places on my arm. At the time of the fire my sleeves were rolled slightly above my elbows. After Clarence and I extinguished the fire on my body I run out the front door and hollered to a gentleman down in front of the Ford agency, told him to call the fire wagon. The fire finally consumed the entire building."

On cross-examination he testified that he had been smoking in the garage that day and that everybody smoked in there so far as he knew but that he did not have a pipe in his mouth or cigarette when the accident occurred; that defendant was standing a little north of the work bench but didn't remember whether he was east of it; that he struck the match on the motor support. His examination then proceeded as follows:

"Q. He lighted his pipe then? A. Yes, sir.

"Q. What did he do with this match? A. He tossed it over his shoulder, or slightly over his shoulder.

"Q. Did he twirl it? A. I don't know.

"Q. What do you mean by 'tossing'? Did he snap it between his fingers like that? (illustrating) A. I don't know.

"Q. To refresh your memory, isn't that what you said before—that he took it between his fingers and twirled it, like that? A. I said he give it a toss, best of my recollection.

"Q. Did you notice the movement on his hand? A. I did to his pipe; I seen him stick it up to his pipe, and the next thing I saw I saw that match coming towards me.

"Q. You don't know why it came towards you. You say, coming toward me. A. I saw the match come toward—

"Q. You didn't notice the movement of his hand? A. Yes, I saw him strike it and bring the match to his pipe, and a small motion like that; but whether he flipped it or not I don't know.

"Q. Did it go over his right shoulder, over back of him? A. If he had been standing like this it would have went like this (indicating).

"Q. He threw with his right hand over his left shoulder? A. He threw like I have shown you.

"Q. Over his left shoulder? A. Yes, sir.

"Q. Where did you see the match last? A. Well, I would judge, a couple or three feet from the tank.

"Q. You never did see it go in your pan of gasoline? A. No, sir.

"Q. You testified here on direct examination that it went in the gasoline, didn't you? A. What else would have set it afire?

"Q. You must testify to what you actually saw. You never did see the match go in your gasoline, did you? A. I didn't, no, sir.

"Q. The match was out before it reached you, wasn't it? A. It was not.

"Q. Was it smoking? A. Sure was.

"Q. You noticed no flame? A. No.

"Q. Just noticed smoke? A. Yes, sir.

"Q. That was while it was in the air between you and Hawkins? A. The match come in a rainbow shape; I could see it—like that (illustrating).

"Q. You noticed it smoking? A. Yes, sir.

"Q. Didn't notice any flame about it? A. No.

"Q. When the match started towards you what did Hawkins do? A. He was turning around.

"Q. Turning which way? A. He made that same motion; turned right around like he had started out; as he struck that match he turned and tossed it over his shoulder, and I don't know what he done then."

Defendant denied the accident occurred in the manner described by plaintiff but stated that he was looking "right at" plaintiff when the fire started; that there was no vessel setting underneath the faucet but the gasoline was running "striking the floor;" that plaintiff had lighted a cigarette before he walked over to the gasoline tank; that "I had not taken my pipe out of my pocket at any time." Defendant was contradicted on this point about his pipe by plaintiff's wife and Clarence Wagner who both testified defendant had his pipe in his hands when he came into the garage; Mrs. Helton also testified

that defendant filled his pipe while talking to her husband, the plaintiff.

On cross-examination defendant admitted that when his deposition was taken he stated that he did not remember whether or not he had his pipe in his hand, filled it and lighted it while talking to plaintiff in the garage., The witness Pete Nicholson, with incomparable preciseness, testified as follows: "I was at Ash Grove the day of this fire. A crowd of us were back of the garage trying to keep the fire out of a telephone pole. Mr. Hawkins was there at that time. I heard him say he was smoking. He said at the time he didn't know whether it caught from that or not—wait a minute—He said he didn't know whether it had ketched from that or not. That is what he said." Whether it was "caught" or "ketched" it is evident that defendant at the time of this conversation remembered that he had been smoking and indicated that his act in so doing might have caused the fire.

There was also uncontroverted evidence that a lighted cigarette would not set fire to gasoline, but that a flame or spark was necessary to cause gasoline to ignite.

The instructions followed the petition and required the jury to find that defendant "carelessly and negligently threw a lighted match into or against said gasoline and caused the said gasoline to ignite and explode, etc." No objection is made to any instructions by appellant but the contention is made there was no evidence to justify the giving of any instruction upon which defendant's liability could be hypothesized. In other words, appellant argues that respondent failed to prove the specific negligence pleaded.

A long line of authorities are cited in support of the proposition that where specific negligence is alleged as the cause of an injury, the right to recover is confined to the proof of the specific act of negligence alleged and recovery is determined by the allegation in the petition and not by the proof adduced. Among the authorities thus cited are Zasemowich v. Mfg. Co., 213 S. W. 799; Yall v. Gillham, 187 Mo. 1. c. 408, 86 S. W. 125; Beave v. Transit Co., 212 Mo. 1. c. 352, 111 S. W. 52.

The rule referred to is so well established as to be almost axiomatic. After reading the array of authorities cited we find none which we consider particularly applicable to the facts in the instant case. Plaintiff alleged that his injury was caused by the throwing of a lighted match into and against the gasoline in which he was washing his hands. This was equivalent, as stated by appellant in his brief, to charging that this accident was caused by a lighted match being thrown into and against the gasoline, and that it was caused in no other way. Plaintiff made no attempt to prove it was caused in any other way although appellant brought out the fact that there were

electric wires running from a generator to a storage battery table located some twelve feet south of the gasoline tank. There was no evidence indicating how close these wires were to the gasoline tank. But regardless of that situation, it undoubtedly devolved upon plaintiff to prove the accident was the result of the specific negligence alleged. This proof may be made either by direct evidence or by reasonable inference from the facts or testimony in the case. [Eckhardt v. Wagner Electric Mfg. Co., 235 S. W. 117; Stratton v. Barnum, 263 S. W. 477; Gerber v. Kansas City, 263 S. W. 432.]

Taking plaintiff's testimony as true, we have positive proof of the following facts: At the time plaintiff was washing his hands at the gasoline tank, defendant was standing just north of the extension on the table used for holding motors; this extension was about eight feet from the west end of the gasoline tank. Plaintiff testified defendant was five or six feet from him when he lighted his pipe on that extension. Whether he was five, six or eight feet from the gasoline tank is not very material, as in any event, it was a very short distance and one across which a match might easily be thrown. Defendant struck the match and lighted his pipe. There can be no question that there was a flame on the match at that particular moment. After lighting his pipe he gave it a toss over his shoulder towards plaintiff and, as he says "come for the gas." Plaintiff testified that he started to jump or rise to his feet but he was afire before he ever got "straightened up." In other words, according to his testimony, the throwing of the match was followed almost instantaneously by the firing of the gasoline. Defendant's learned counsel lay great stress on plaintiff's testimony on cross-examination. He stated that he did not see the match actually go in the gasoline; that when he last saw the match it was two or three feet from the tank; that he noticed it was smoking but did not notice a flame. He stated positively, however, that the match was not "out" before it reached him; and that he could see the match coming toward him "in a rainbow shape." We believe defendant's able counsel mis-interpret this testimony. Plaintiff's statement that he saw no flame cannot be reasonably construed as meaning there was no flame at the time he last saw the match describing its arc through the air. There is no testimony that the match, after being lighted, was ever extinguished. It is a matter of common knowledge that lighted matches, carelessly cast away, do not always "go out." Can it then be said that because plaintiff saw nothing but smoke from the match, flaming but a moment before, that, therefore, there was no flame? Even the tiniest flame, so small that, when concealed more or less by the smoke, it would not be decernable to the eye during the brief instant the match was passing through the air, would have been sufficient to ignite the gasoline. Moreover, we must accept as an established fact

that plaintiff, himself, was not smoking, and as we read the record there is no evidence that the fire was caused in any manner other than related by plaintiff. The fact that there is no other plausible theory is a circumstance to be considered. In the case of Coffman v. Mc-Causlin, 70 Mo. App. 34, l. c. 40, in considering the question of whether a traction engine set fire to a field, the Kansas City Court of Appeals uses this language: "evidence tending to show the machine was propelled through the field when the fire originated, by use of fire and steam in the engine; that shortly after passing through, the fire was discovered with signs of its having started near where the machine passed; and that scorched or partly burned chips, such as were used in the engine, were found in its track through the premises; and that no other cause of the fire existed, will be sufficient evidence of the ultimate fact to be ascertained to justify a submission to the jury."

In Daly v. Pryor, 197 Mo. App. 583, l. c. 586, 198 S. W. 91, the court lays stress on the absence of any reasonable theory save the one advanced by plaintiff and states the law follows: "While it was the duty of plaintiff to establish this fact and make out a prima-facie case and not the duty of the defendant to advance a more plausible theory as to show how deceased met his death, the evidence fails to disclose any reasonable theory other than that the deceased fell from the rear of the train." To the same effect are Buesching v. St. Louis Gaslight Co., 73 Mo. 219; Soeder v. Railroad, 100 Mo. 673, 13 S. W. 714; Stratton v. Barnum, 263 S. W. 467; Gerber v. Kansas City, 263 S. W. 432.

In Owens v. Moberly Oil Company, 245 S. W. 369, it appears that the plaintiff suffered the destruction of his blacksmith shop by fire. The fire was alleged to have been caused by the negligence of defendant's truck driver in unloading gasoline into plaintiff's storage tank. Plaintiff alleged that the vapor arising from the gasoline was caused to explode by coming into contract with fire in a forge situated in the blacksmith shop. There was evidence tending to prove that fact but also proof that the explosion was caused by reason of the vapor coming in contact with a lighted pipe being smoked at the time by one of plaintiff's employees, or by a match which this employee struck. The Kansas City Court of Appeals held it was a question for the jury as to whether the explosion occurred as alleged in plaintiff's petition.

In the case at bar, for the purposes of this demurrer, we have the following facts: Defendant lighted a match and threw it toward plaintiff, who was washing his hands in gasoline, which was pouring from a faucet into a vessel; this match was seen in the air three feet from plaintiff and coming toward the gasoline; plaintiff was not smoking but was kneeling down; before he could straighten up to

jump away, after he saw the match coming, he was in flames; no plausible theory, except that the match set fire to the gasoline, is advanced. We are of the opinion, therefore, under the authorities cited, that it was a question for the jury to decide as to whether the fire was caused as alleged in plaintiff's petition. This view disposes of all appellant's contentions save one, which we shall now consider.

The point is made that it devolved upon plaintiff to show there was such connection between the negligent act of appellant and the injury as to bring it within the reasonable contemplation of appellant that such injury would naturally and probably result from his act in throwing his match down after lighting his pipe, and that as such it ought to have been foreseen by appellant as likely to flow from his act. This is the rule announced in Porter v. Anheuser-Busch, 24 Mo. App. 1; Cole v. Savings & Loan Society, 124 Fed. 113, and other cases cited. Our attention is also called to the language used in Smith v. Ozark Water Mills Company, 215 Mo. App. 129, l. c. 141, 238 S. W. 573, l. c. 576, decided by this court, wherein it is said that defendant will be liable ''for everything which, after the injury is complete, appears to have been a natural and *possible* consequence of his act or omission.'' (Italics ours). It is pointed out by appellant that the use of the word ''possible'' is not in line with the authorities in this State and that it was either an oversight or an error of the printer. In this we believe appellant is correct and that the rule stated in the Smith case (supra) is the proper rule but for the use of the word ''possible'' instead of ''probable.'' The authorities cited in support of the rule indicate that the use of the word ''possible'' was undoubtedly a mistake of the typist or printer. With that principle of law in mind, we have carefully considered all the facts and circumstances of this case and are of the opinion the evidence was sufficient to take to the jury the question of causal connection between the negligence complained of and plaintiff's injuries. It is a matter of common knowledge, of which we take judicial notice, that gasoline is a highly inflammable liquid. Defendant, as a man of ordinary prudence, was aware of that fact. He also states in his testimony that he ''knew where the gasoline tank stood, it was a fifty or sixty gallon tank laying on its side—I was looking right at him when this fire happened. I saw gasoline running, it was striking the floor.'' He also states that he saw defendant go over to the gasoline tank, turn on the faucet and start to washing his hands. It is contended that since the proprietor of the garage permitted smoking in and around the garage that defendant should not be held responsible for doing the very thing which plaintiff and others did. Smoking around a garage, we opine, is a dangerous pastime whether indulged in near a gasoline tank or at some other location. But we perceive a vast difference between ordinary promiscuous smoking in the garage

and the particular circumstances here involved. Defendant must be presumed to know that a lighted match thrown into gasoline was likely to cause a fire or explosion. He knew of the presence of the gasoline, knew the direction it was from him and threw a lighted match, inadvertently no doubt, into it. If he had thrown a lighted match to the floor in some other part of the garage where he had no knowledge of the presence of gasoline or other inflammable material, we would have a different case. It is our opinion, defendant must be held to have had reason to anticipate the fire which resulted from his negligence in throwing the match. Finding no error, the judgment is affirmed.

*Cox, P. J.*, and *Bradley, J.*, concur.